## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

JAMES HILL,                          :

        Plaintiff,            :

                                  Case No. 3:07CV00201

  vs.                              :

                                  District Judge Walter H. Rice

MICHAEL J. ASTRUE,                   :     Magistrate Judge Sharon L. Ovington
    Commissioner of the Social
    Security Administration,          :

        Defendant.            :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.    INTRODUCTION

Plaintiff James Hill formerly worked in an automotive factory, as a painter, and as a parking attendant.  Claiming to be disabled since June 10, 2002, by chronic back pain and right leg pain attributable to scoliosis, he sought financial assistance from the Social Security Administration by applying for disability insurance benefits ["DIB"] and supplemental security income ["SSI"] with a protective filing date of October 15, 2002.

After various administrative proceedings, Administrative Law Judge ["ALJ"] Thomas R. McNichols II denied Plaintiff's DIB and SSI applications based on his

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

conclusion that Plaintiff is not "disabled" within the meaning of the Social Security Act. (Tr. 27).  The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration.  Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #9), Plaintiff's reply (Doc. #10), the administrative record, and the record as a whole.

Plaintiff seeks a reversal of the ALJ's decision and an award of benefits (Doc. #7 at 12, 20), or alternatively, that this case be remanded to the Social Security Administration to correct certain alleged errors.  (*Id.* at 20).  The Commissioner seeks an order affirming the ALJ's decision.  (Doc. #9 at 16).

## II.    FACTUAL BACKGROUND

At the time of the ALJ's decision, Plaintiff's age [47] placed him in the category of a "younger person" for purposes of resolving his SSI application.  *See* 20 C.F.R. § 416.963(c).  (Tr. 24).  Plaintiff has a high school education.  20 C.F.R. § 416.964(b)(4).  (Tr. 24).  He also has experience as a house painter, which is classified as a skilled occupation (Tr. 372), although the skills are not transferable.  (Tr. 374).

During the administrative hearing on January 19, 2005, Plaintiff testified that he is the father of a then 20-year-old son who was living with him, and a then 3-year-old daughter who lived with her mother.  (Tr. 336).  He has no military experience or vocational training.  (Tr. 337).  He has not worked since June 2002, when he left his job

2

in a manufacturing plant due to back pain and right leg numbness (Tr. 338) caused by

scoliosis.  The numbness is the product of pinching of his sciatic nerve due to the

curvature of his spine.  (Tr. 341).  He testified that he has "almost complete numbness in

my toes" (*id.*), and numbness in his right foot "all the time."  (Tr. 342).  He also has

muscle spasms in his back (Tr. 339), as well as breathing problems due to "diminished

lung capacity" in his left lung (*id.*), which "never fully developed."  (Tr. 343).  When he

exerts himself physically and "in the summertime when . . . the air is a certain way, it's

really hard to breathe."  (*Id.*).

He has had scoliosis all his life, but "the curvature increases as you get older" (Tr.

340), and "it kept getting worse and worse and worse."  (Tr. 339-40).  "[T]hat's what . . .

happens with scoliosis.  . . . [I]t doesn't get better.  It just increases and . . . I develop

more and more problems, more and more pain."  (Tr. 343).  His doctors have confirmed

his increasing spine curvature by taking MRIs and x-rays, and by "measur[ing] the degree

of my curvature . . . at various intervals."  (Tr. 344).  His back pain remains "constant,"

"typically a six or seven" on a scale of zero to 10, even when using his spinal cord

stimulator, but "sometimes it goes . . . up.  It gets up there."  (Tr. 350).  He said, "I can't

really explain the pain. . . . [I]t interferes with every, every aspect of my life. . . . I can't

even pick[ ]up my daughter. . . . I have to adjust everything in my house so that I can

reach it . . . Everything that I do . . . is centered around me not getting in more pain."  (Tr.

370).

Plaintiff testified that he held a job for years with scoliosis, "[b]ut it just

3

progressed." (Tr. 362-63). "[I]t didn't happen all of a sudden . . . I've been living with pain all of my life." (Tr. 362). The pain "had been progressing" until "it got to the point where I just couldn't, couldn't do anything with it." (Tr. 338). He stopped working because "the pain just became too unbearable." (Tr. 337-38). "It just got worse and worse to the point where the things that I do in a normal work, . . . that I [had] been doing for all my life, I just couldn't do. Simple things like, you know, pushing carts or filling up a basket with parts or . . . running the machine . . . I just couldn't do it." (Tr. 363). Plaintiff said he also "started becoming more and more absent from work and that was getting to be a problem. . . . [S]ome days I just couldn't get out of bed and I couldn't come in. So I just called in sick," but "you can only do that so much." (*Id.*).

When Plaintiff went to see his family doctor in June of 2002, "he immediately put me in the hospital." (*Id.*). "[T]hat's when I started going to all these . . . other doctors." (*Id.*). Plaintiff then left his job, first on short-term, then long-term, disability. (Tr. 364). He had been on long-term disability about two and a half years as of the hearing date.

Plaintiff has tried "physical therapy, chiropractor . . . pain medicines" for his back, and now has used a spinal cord stimulator since 2003. (Tr. 340, 341). He went through a series of three nerve block injections, "and they didn't help at all." (Tr. 370). The stimulator "does help . . . it's, at least, it's bearable, you know[,] but the pain is still there." (Tr. 341). He continues to see Dr. Moncrief for periodic adjustments to the stimulator. (Tr. 347). The device works well unless Plaintiff is active, when "[t]he pain increases to the point where . . . the s[t]imulator doesn't even help." (Tr. 366). At the

4

time of the hearing, Plaintiff's stimulator had been turned "on max" "for about an hour." (*Id*.).  Although he still has pain "[a]ll day, every[ ]day," even with the stimulator (Tr. 366), Plaintiff intends to continue using it.  (Tr. 341).  At the time of the hearing, Plaintiff also was walking with the assistance of a cane prescribed by Dr. Corney (Tr. 350) "for balance . . . just [to] keep the pressure off of [my back] and my leg."  (Tr. 351).  He claimed to use the cane "all the time if I have to walk anywhere," and "around the house a lot[,] too."  (Tr. 350).

Plaintiff also continues to take pain medications (Tr. 340, 341) everyday (Tr. 349), which cause some side effects.  (Tr. 348).  One drug ["Neurontin"? (*see* Tr. 389)] makes him stammer "a whole lot;" "I never used to do that before."  (*Id.*).  The combination of medications also makes him "drowsy a little bit," so "[w]hen I have to do something . . . important . . . , I try to hold off taking them" (*id.*), "but . . . then the pain comes."  (Tr. 348-49).  His doctors have "changed my medication so many times . . . to get the right balance . . . with the stimulator."  (Tr. 349).  "[T]he dosage of the medication that I have to take for pain . . . can't be any lower and . . . if it's any higher, it will really have me out of it."  (*Id*.).  The medication does help with the pain.  (Tr. 351).  Other than adjusting his stimulator and occasionally alternating his medications when he "get[s] used to a certain pain medicine[ ] and . . . it doesn't work too good anymore," Plaintiff anticipates no other treatments for his condition in the future.  (Tr. 368).

In December 2002, an orthopedic surgeon, Dr. Lehner, recommended "a real involved surgery," but "[i]t would just correct the curvature," not "help my pain any, "

5

because "the nerves are already damaged." (Tr. 340, 365). Plaintiff testified that such back surgery is the only treatment that might help his breathing problems, but "that's so involved and . . . would require somebody to really care for me 24 hours a day." (Tr. 345). He said, "I can't see myself doing that because . . . I don't have anybody to take care of me if I do." (Tr. 368). He had not seen Dr. Lehner for couple of years prior to the hearing, because "other than the surgery, there wasn't much more he could do." (Tr. 365).

Plaintiff also testified that he has problems with anxiety. (Tr. 345-46). His doctor prescribed Zoloft "a long time ago," but it caused nightmares. (Tr. 346). He had not received counseling for anxiety, but was "scheduled to see a . . . therapist" at the time of the hearing. (*Id.*). He has "a lot of problems sleeping," and finds it "hard to concentrate." (*Id.*). At night, "I try to stay up until I make myself get sleepy . . . and that's about 2:00 a.m. or 3:00 a.m." (Tr. 352). He will "just get up and down" because "I can't get comfortable and . . . it's hard to sleep when you're in pain." (*Id.*). He also suffers from migraines (Tr. 350) about once a month. (Tr. 351). He treats them by "turn[ing] off the radio or the t.v. and [not] moving around." (*Id.*). He does not take medication for migraines other than his regular pain medications. (Tr. 351-52).

He testified at first that he probably is most comfortable standing (Tr. 352) to "take the edge off" (Tr. 353), but said that he can do so only for "about three or four minutes" (Tr. 353) because "it's just not comfortable." (Tr. 354). He then clarified his testimony, saying that "I feel more comfortable sitting . . . just resting," but "I feel . . . [standing]

6

takes the pain off a little bit." (*Id.*). He prefers "just moving," "sit[ting] and stand[ing] . .

. as I need to . . . to relieve some of the pressure." (*Id.*). The ALJ noted on the record that

"you've been getting up and down today." (Tr. 354; *see also* Tr. 339, 346 [Plaintiff's

attorney notes on record that "[t]he claimant is standing."]; Tr. 376 [Plaintiff's attorney

states that "the hearing lasted for about 55 minutes and [Plaintiff] stood about five times

during the hearing."]). Plaintiff testified that if he alternates standing and sitting, he can

sit for "[m]aybe about five or 10 minutes." (Tr. 355).

Plaintiff is able to use his arms, hands and fingers. (*Id.*). As to limitations on his

daily activities, Plaintiff testified that he is able to lift a gallon of milk, but cannot "reach

and lift anything." (*Id.*). He cannot climb stairs, but has none where he lives, and no

longer rides the bus since his son purchased a car and transports him. (Tr. 355-56; *see*

*also* Tr. 336). When he last had tried to climb stairs, "I just got a little dizzy and . . . just

stopped . . . [t]o take a little breather" before continuing to the top. (Tr. 367). The

climbing caused pain in his back and lower right leg. (*Id.*).

Plaintiff can walk only about "half a block" without stopping, and must "just take

my time" in order to do that. (Tr. 368). He does not wash dishes, mop, vacuum or do

yard work, and has not taken any trips since he stopped working. (Tr. 357-58, 359-60).

Any cooking is done by his son. (Tr. 357-58, 362). He can sweep, and does wash clothes

and make beds. (Tr. 358). He goes to the grocery store with his son and "tell[s] him what

to get," but does not shop in any other type of store. (Tr. 358). He does not go to church,

the movies or to visit friends or relatives, although they sometimes come to visit him.

(Tr. 359, 361).  Plaintiff was doing some stretching exercises until Dr. Moncrief directed him to discontinue them, so he now gets no exercise.  (*Id.*).  He can feed, dress and groom himself.  (Tr. 360).

Plaintiff described a typical day as one in which "I'm usually up about 6:00 a.m." and "watch the news."  (Tr. 361).  "I feed my cat . . . and I put me something in the microwave and eat."  (*Id.*).  Then he'll "look at t.v.," "[t]ake my medicine, of course," and follow "[j]ust pretty much the same routine" in the afternoon.  (*Id.*)  Plaintiff's son goes to work in the late afternoon, and "[w]e eat . . . when he comes home" at about 9:15 p.m.  (Tr. 361-62).

Plaintiff denied that he could perform a job where he might be sitting down most of the time.  (Tr. 356).  Asked if he could do such a job if he were able to stand up when he needed to, Plaintiff responded, "[W]ell, to be honest, I, I[ ] probably[ ] could, could do the work at one, for one day or so[,] but I wouldn't be reliable because there are some[ ]times when I just can't get out of bed" because the pain is "too much," "even with the stimulator."  (*Id.*).  Asked if he intended "to try to go back to work any time in the future," Plaintiff replied that "I wouldn't do that to any employer," repeating that "I know . . . there's several times during the month when I couldn't get out of bed."  (Tr. 357).  That happens probably "five or six times a month[,] at least."  (Tr. 369).

Plaintiff's testimony was followed by that of a vocational expert, who testified that about 5,000 "light" jobs and 3,400 "sedentary" jobs exist in the regional economy for a hypothetical person with Plaintiff's characteristics and certain specified restrictions,

8

including "the opportunity to alternate between sitting and standing as needed." (Tr. 372-73). He cited "a security systems monitor or an injection molding machine tender" as examples of such jobs at the sedentary level. (*Id.*). He stated that five absences per month "doesn't allow someone to do the job." (Tr. 374).

Although no medical expert testimony was presented at the January 19, 2005 hearing, Plaintiff submitted exhibits including extensive medical records. (Tr. 136-272). In closing, Plaintiff's attorney argued that such records were sufficient to prove Plaintiff's claim, but urged the ALJ to "send the claimant out for a physical exam" if he found otherwise. (Tr. 375, 376).

The ALJ held a second administrative hearing on August 22, 2005. (Tr. 378-400). At the supplemental hearing, Dr. Richard Hutson appeared as a medical expert, both testifying and questioning Plaintiff. (Tr. 381-92, 396-98). Plaintiff also presented additional medical exhibits. (Tr. 380-81; *see* Tr. 273-313). The parties have provided detailed and informative descriptions of the medical records and other pertinent evidence. (*See* Doc. #7 at 3-9, 11; Doc. #9 at 3-8, 9). In light of this, and upon consideration of the complete administrative record, there is no need to fully reiterate the parties' descriptions. Still, describing a few medical source opinions will help frame further review.

The ALJ relied heavily on the testimony of Dr. Hutson. (*See* Tr. 17, 19, 23). Dr. Hutson testified that he is a medical doctor "[s]ubspecializing in orthopedic surgery." (Tr. 381). Based on his review of Plaintiff's medical records included among the

administrative exhibits from the first hearing,[2] Dr. Hutson diagnosed Plaintiff with "a longstanding . . . idiopathic scoliosis . . . from L2 down to T5[,] with a large rib hump," along with "well documented" degenerative changes in the lumbar spine.  (Tr. 382). Opining that Plaintiff has "a vertebrogenic disorder" (Tr. 383, 392), he nonetheless concluded that Plaintiff "does not have the appropriate loss of neurological function to either meet or equal" a Listing 1.04 impairment.  (Tr. 383; *see also* Tr. 392).  Still, in light of "[t]he significant amount of scoliosis that he has and degenerative disc disease, I would absolutely limit him to sedentary work" (Tr. 392), as "the objective medical evidence of record doesn't show that this man can't do sedentary work."  (Tr. 397).

Dr. Hutson declined to express an opinion as to whether being absent from work three times a week due to pain would be reasonable based on Plaintiff's medical history, stating that "there's no test for pain."  (Tr. 393).  He did testify, however, that the significance of the type of spinal surgery proposed by Dr. Lehner would be "huge."  (Tr. 397).  "I mean, you're talking about fusing him from the second thoracic vertebrae, which is where your second rib is located[,] to the bottom of the lumbar spine.  Almost to the bottom.  That's almost the entire spine except for the cervical area."  (*Id.*).  Dr. Hutson "would hope that if a man had a fusion of that length that he would . . . be able to function better than he's functioning without the fusion."  (*Id.*).  However, "[i]t's very difficult to get somebody to fuse over that extensive length of the spine."  (*Id.*).  He agreed that

---

[2]Plaintiff argues, and the record suggests, that Dr. Hutson's opinions were formulated without the benefit of the additional medical exhibits admitted at the second hearing.  (Doc. #10 at 2).  (*See* Tr.380-81).

Plaintiff's normal activities of living on a day-to-day basis would be significantly compromised by such a spinal fusion. (Tr. 397-98). Again, however, he opined that "sedentary work would be in line, I would think." (Tr. 397).

Dr. Hutson's opinion contradicted those of Plaintiff's treating physicians. In submitting medical information requested by the Ohio Bureau of Disability Determination, Dr. Isaac Corney, Plaintiff's then primary care physician, opined in January of 2003 that in light of Plaintiff's "severe antalgic gait, weakness and constant pain," it "would be difficult" for him "to sustain any full time job." (Tr. 200). In August 2004, a subsequent primary care doctor, D. Dickens, M.D., also opined that Plaintiff was "unable to work" and "permanently disabled." (Tr. 269). Dr. Hugh Moncrief, a neurosurgeon to whom Plaintiff was referred for pain and who implanted Plaintiff's spinal cord stimulator, stated in March 2004 that "I do not feel at this time the patient would be able to return to work in any type of gainful employment." (Tr. 270). In a report dated December 2, 2002, Dr. James T. Lehner, an orthopedic surgeon, opined that even with drastic spinal fusion surgery to correct Plaintiff's spinal curvature, "I do not think that he would ever go back to any kind of gainful employment." (Tr. 259).

Finally, Dr. Bhimavarapu K. Reddy, a pain specialist who evaluated Plaintiff shortly after the first administrative hearing, described Plaintiff's condition as "poor and guarded." "His symptoms are not expected to improve and will, most likely, continue to worsen. Without corrective surgery, his heart and lung functions could be compromised . . . His ability to sit, stand, walk, bend, climb or lift is restricted, limiting his ability to

11

perform even his daily chores."  (Tr. 312).  Dr. Reddy concluded that "Mr. Hill suffers

with a chronic, progress condition that will continue to cause him pain and limit his

physical capabilities.  He is not expected to be able to return to work or to maintain any

type of gainful employment."  (*Id.*).

## III.    THE "DISABILITY" REQUIREMENT AND ADMINISTRATIVE REVIEW

The term "disability" as defined by the Social Security Act carries a specialized

meaning of limited scope.  Narrowed to its statutory meaning, a "disability" includes only

physical or mental impairments that are both "medically determinable" and severe enough

to prevent the claimant (1) from performing his or her past job, and (2) from engaging in

"substantial gainful activity" that is available in the regional or national economies.[3]  *See*

*Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Social Security Regulations require ALJs to resolve a disability claim through a

five-step sequential evaluation of the evidence. *See* Tr. 18-30; *see also* 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4).[4]  Although a dispositive finding at any step terminates

the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully

considered, the evaluation answers five questions:

1.    Is the claimant engaged in substantial gainful activity?

---

[3] Impairments also must be either expected to cause death or last twelve months or longer. *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.

[4] The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations.  Plaintiff met the insured-status requirement for DIB eligibility through December 31, 2008.  (Tr. 18).  *See Colvin*, 475 F.3d at 730.

2.      Does the claimant suffer from one or more severe impairments?

3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

In the present case, the ALJ conducted the appropriate sequential review.  He addressed Step 1 with his finding that "[t]he claimant has not performed substantial gainful activity since June 10, 2002."  (Tr. 25 at ¶2).  As to Step 2, he found that Plaintiff has "a 'severe' impairment of chronic back pain and right leg pain attributed to life-long scoliosis."  (*Id.* at ¶3).

The ALJ determined at Step 3 that the severity of Plaintiff's impairment or combination of impairments does not meet or equal one listed in the Regulations.  (*Id.*).  He made a Step 4 determination that Plaintiff retains a residual functional capacity "for a limited range of sedentary work[5] subject to: 1) alternate sitting and standing as needed; 2)

---

[5]As defined by the Regulations, sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

no work on uneven surfaces; 3) no climbing of stairs, ropes, scaffolds, or ladders; 4) no balancing; 5) no more than occasional stooping, kneeling, crouching, or crawling; and 6) no exposure to hazards or extremes of temperature or humidity." (Tr. 26 at ¶5). He also found that Plaintiff "is unable to perform his past relevant work." (*Id.* at ¶6).

At Step 5, considering his other factual conclusions regarding Plaintiff, the ALJ found that "there are a significant number of jobs in the national economy" that Plaintiff could perform, including "security monitor and injection mold machine tender." (*Id.* at ¶12). This assessment, along with the ALJ's other findings throughout his sequential evaluation, led him ultimately to conclude that Plaintiff was not under a disability and hence not eligible for DIB and SSI. (Tr. 27).

## IV. STANDARDS OF JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria." *Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "'more than a scintilla of evidence but less than a preponderance . . .'" *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*. *See Cutlip v. Sec'y of Health and Human Servs.*, 25 F3d 284, 286 (6th Cir. 1994). The Court's agreement or disagreement with the ALJ's findings plays no role in the substantial evidence review, and no significance attaches to contrary evidence in the record, if other substantial evidence supports the ALJ's findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

A finding of substantial supporting evidence, however, does not end the judicial inquiry. Reviewing the legal criteria applied by the ALJ may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *See Bowen*, 478 F3d at 746. This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

**DISCUSSION**

**A.     Plaintiff's Contentions**

Plaintiff contends that the ALJ erred in finding that Plaintiff retains a residual functional capacity to perform sedentary work, in light of multiple treating physicians' contrary opinions that Plaintiff is unable to perform any substantial gainful employment. (Doc. #7). Specifically, Plaintiff asserts that the ALJ "failed in his evaluation of treating

source opinion and in his assessment of [Plaintiff's] pain" (*id.* at 12), in that he did not cite to the applicable regulatory factors, rulings or cases, and "simply failed to acknowledge the deference the Commissioner's own regulations generally place on treating physicians' opinions." (*Id.* at 15). He also argues that while the ALJ correctly listed the factors that must be considered in assessing pain, he failed to apply those factors correctly. (*Id.* at 17-20). He urges that reversal is appropriate (Doc. #7 at 12, 20), or that, "[a]t a minimum, remand is required to address" to ALJ's errors. (Doc. #7 at 20, Doc. #10 at 6).

In opposing remand, the Commissioner argues that substantial evidence supports the ALJ's residual functional capacity finding. (Doc. #9). He urges that "Dr. Hutson's opinion is particularly persuasive because he was the only medical source to review the entire record and [he] questioned Plaintiff." (*Id.* at 11 [citing Tr. 381-97]). He also cites Dr. Hutson's "expertise in orthopedic surgery," another medical source's "less restrictive" opinion regarding work-related limitations, and other evidence "including the effectiveness of [Plaintiff's] treatment modalities, his activities, and the lack of side effects from medications." (*Id.* [citing Tr. 23, 166-74, 24]). The Commissioner further urges that treating physicians' opinions regarding disability are not considered "medical opinions" for purposes of analysis under the regulations, and that the ALJ's treatment of such opinions therefore was not error. (*Id.* at 12-13). Finally, he asserts that the ALJ's findings regarding the credibility of Plaintiff's pain complaints are entitled to deference, and that the ALJ's non-disability finding is supported by the vocational expert's

16

testimony.  (*Id.* at 13-15).  The Commissioner thus requests that the ALJ's decision be affirmed.  (*Id.* at 16).

> **B.    Medical Source Opinions**

The Social Security Regulations require ALJs to evaluate every medical opinion of record regardless of its source.  *See* 20 C.F.R. § 416.927(d).  The treating physician rule provides that a treating physician's opinion is entitled to controlling weight so long as it is (1) well supported by medically acceptable data, and (2) not inconsistent with other substantial evidence of record.  20 C.F.R. § 416.927(d)(2); *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  When these requirements are not met, the treating physician rule does not apply.  *Id.*

If the ALJ concludes that a particular treating source's opinion is not entitled to controlling weight under the rule, the ALJ must continue to evaluate that treating source's opinion by considering the following additional factors:

1.    The length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship;

2.    The 'supportability' of the opinion – whether it is supported with relevant evidence and whether it is well explained;

3.    The consistency of the opinion with the record as a whole;

4.    The specialization, if any, of the treating source; and

5.    'Other factors' brought to the ALJ's attention, including, for example, the treating source's knowledge of the SSI or DIB programs and its evidentiary requirements.

17

20 C.F.R. § 416.927(d)(2)-(6); *see Wilson*, 378 F.3d at 544.  In order to comply with the

Regulations, "a decision denying benefits 'must contain specific reasons for the weight

given to the treating source's medical opinion, supported by the evidence in the record,

and must be sufficiently specific to make clear to any subsequent reviewers the weight the

adjudicator gave to the treating source's medical opinion and the reasons for that weight."

*Id.* (citing Soc. Sec. Rul. 96-2p, 1996 WL 3741888, at *5 (1996)).

   As to other medical sources – such as one-time examiners or medical experts who

testify during the administrative hearing – ALJs must weigh their opinions using the same

"relevant factors," including supportability, consistency and specialization.  *See* 20 C.F.R.

§ 416.927(d), (f).  The Regulations appear to emphasize this requirement by reiterating it

no fewer than three times. *See* 20 C.F.R. § 416.927(d) ("we consider all of the following

factors in deciding the weight to give any medical opinion...."); *see* also 20 C.F.R. §

416.927(f)(ii) (factors apply to opinions of state agency consultants); 20 C.F.R. §

416.927(f)(iii) (same as to medical experts' opinions); Social Security Ruling 96-6p, 1996

WL 374180 at *2 (same).

   **C.**     **<u>Analysis</u>**

   In response to Plaintiff's contention that the ALJ erred by discounting the opinions

of Plaintiff's treating physicians after an incomplete legal analysis, the Commissioner

argues that those doctors' opinions regarding Plaintiff's inability to work "were not

considered 'medical opinions' for purposes of 20 C.F.R. §§ 404.1527(d)(2) and

416.927(d)(2)."  (Doc. #9 at 12).  Defendant suggests that such opinions "by their very

18

nature were not entitled to significant weight" (*id.*), and thus presumptively, "the ALJ was not required to further evaluate the conclusory opinions of Plaintiff's treating sources." (Doc. #9 at 13).

The primary authority on which the Commissioner relies for that proposition is 20 C.F.R. §§ 404.1527(e), 416.927(e) ["A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."]. Case law, however, belies Defendant's inference from that point. "While controlling weight will not be provided to a treating physician's opinion on an issue reserved to the Commissioner, the ALJ still must 'explain the consideration given to the treating source's opinion(s).'" *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) (citing SSR96-5: Policy Interpretation Ruling Titles II & XVI: Medical Source Opinions on Issues Reserved to the Commissioner, 61 Fed.Reg. at 34474]. Under the heading "Policy Interpretation," the specific policy ruling cited in *Bass* does recognize that "some issues [under 20 C.F.R. §§ 404.1527(e) and 416.927(e)] are not medical issues regarding the nature and severity of an individual's impairment(s)," but further provides as follows:

> Nevertheless, our rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner . . .
>
> * * *
>
> . . . [O]pinions from any medical source on issues reserved to the Commissioner must never be ignored. The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability,

including opinions from medical sources about issues reserved to the Commissioner.  If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.

**In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 C.F.R. 404.1527(d) and 416. 927(d)**. * * *

*Id.*, 1996 WL 374183 at *2, *3 (S.S.A. July 2, 1996) (emphasis added).

Other decisions in this Circuit also have acknowledged the value of even those treating physicians' opinions which "come close to stating an ultimate opinion about the existence of a disability."  *See Sharp v. Barnhart*, 152 Fed. Appx. 503, 509, 2005 WL 2811812, at *5 (6th Cir. Oct. 26, 2005).  In *Sharp*, noting that the treating physicians' opinions at issue "came at the end of extensive treatment," the Court found that the ALJ erred in giving "only a generalized comment that the treating physicians' opinions 'were not based on a solid clinical and diagnostic foundation,' with no elaboration or detail," as such cursory dismissal did "not satisfy the procedural requirements for rejecting a treating physician's opinion laid out in § 404.1527(d)(2)."  *Id.* at 510, 2005 WL 2811812, at *6. That rationale is particularly applicable in this instance, where many of the treating physicians were offering opinions as to Plaintiff's physical restrictions in the context of substantive reports outlining their familiarity with his medical history and chronic condition (*see, e.g.*, Tr. 199-200, 258-259, 270-71, 309-313), not merely producing a

"conclusory statement that [Plaintiff] is disabled."  *See Sharp*, 152 Fed. Appx. at 509,

2005 WL 2811812, at *5.  Such opinions clearly were entitled to consideration under 20

C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).

In reversing and remanding the ALJ's decision in *Sharp*, the Court of Appeals also

made the following observation, which is no less apt in the case now at issue:

> What the court said in *Wilson*[, 378 F.3d at 544] applies with
> equal force here: "The requirement of reason-giving exists, in
> part, to let claimants understand the disposition of their cases,
> particularly in situations where a claimant knows that his
> physician has deemed him disabled and therefore might be
> especially bewildered when told by an administrative
> bureaucracy that [he] is not."

*Sharp* at 510, 2005 WL 2811812, at *6.

Having been told by no fewer than five treating physicians that they consider him to

be unable to work due to the severity of his scoliosis and the resultant pain, Plaintiff Hill's

"bewilderment" that the ALJ does not believe him to be disabled, based largely upon the

opinion of a doctor who never even physically examined Plaintiff, would be

understandable.  This situation presents a compelling example of why detailed rationale is

required for the Social Security Administration's non-disability decisions.

For the foregoing reasons, the Court concludes that the ALJ committed a legal error

by failing to properly evaluate the treating physicians' opinions in assessing Plaintiff's

residual functional capacity.

There remains the possibility that the ALJ's error in this regard was harmless, *see*

*Bowen*, 478 F.3d at 747-49, an issue neither party specifically addresses.  Here, however,

21

the error consists of the ALJ's failure to adhere to established regulatory procedures.  "A court cannot excuse the denial of a mandatory procedural protection simply because . . . a different outcome on remand is unlikely.  '[A] procedural error is not made harmless simply because the [aggrieved party] appears to have had little chance of success on the merits anyway.'  To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with §1527(d)(2), would afford the Commissioner the ability to violate the regulation with impunity and render the protections promised therein illusory.  The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action . . . found to be . . . without observance of procedure required by law.'"  *Wilson*, 378 F.3d at 546 (internal citations omitted).

Moreover, a review of the entire record in this matter does <u>not</u> compel a conclusion that "a different outcome on remand is unlikely."  *See id*.  Here, evidence of the debilitating nature of Plaintiff's impairment, while perhaps not "overwhelming" in a legal sense, certainly is very strong.  Five treating physicians opined based upon their own objective findings that Plaintiff's condition is so severe as to render him unable to work.  Multiple objective medical tests confirm the existence of a 64 degree curvature of Plaintiff's spine.  (*See, e.g.,* Tr. 165).  Pages of medical records through the first administrative hearing date document attempts to treat Plaintiff's pain through physical therapy, medications, spinal injections, and ultimately, surgical implantation of an electronic device into Plaintiff's abdomen.  (*See* Tr. 136-272).  Plaintiff testified at the

22

second administrative hearing, and later medical records confirm, that surgical implantation of a morphine pump also was being considered as a possible source of pain relief.  (Tr. 285, 312, 391).  No medical evidence suggested a lack of foundation for Plaintiff's subjective complaints of pain, and the medical expert on whom the ALJ largely relied expressly declined to offer an opinion on that subject.  (Tr. 393).

In light of the volume and consistency of such evidence, the ALJ's error clearly was not "harmless" in this instance.  Accordingly, Plaintiff's challenges to the ALJ's evaluation of the medical source opinions are well taken, obviating the need for an in-depth analysis of Plaintiff's remaining assignments of error.

## V.    REMAND IS WARRANTED

If an ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence 4 of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

23

As noted *supra*, a review of the administrative record in this matter <u>does</u> suggest that this is a case in which "the proof of disability is strong and evidence to the contrary is lacking."  *See id*.  In light of the finding that the ALJ made an error of law, however, remand of this matter to the Social Security Administration pursuant to Sentence 4 of § 405(g) is appropriate, to permit the ALJ to reassess Plaintiff's residual functional capacity. On remand, the ALJ should be directed (1) to re-evaluate the medical source opinions of record under the legal criteria set forth in the Commissioner's Regulations, Rulings, and as required by case law; and (2) to reconsider, under the required sequential evaluation procedure, whether Plaintiff was under a disability and thus eligible for SSI.  Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

### IT IS THEREFORE RECOMMENDED THAT:

1.　　The Commissioner's nondisability findings be vacated;

2.　　No finding be made as to whether Plaintiff James Hill was under a "disability" within the meaning of the Social Security Act;

3.　　This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report; and

4.　　The case be terminated on the docket of this Court.


August 12, 2008　　　　　　　　　　　　　 s/ Sharon L. Ovington     
　　　　　　　　　　　　　　　　　　Sharon L. Ovington
　　　　　　　　　　　　　　　　　　United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Am,* 474 U.S. 140 (1985).